1
2
3
4          UNITED STATES DISTRICT COURT
5        NORTHERN DISTRICT OF CALIFORNIA
6

7  FRANK J. FODERA, JR., et al.,          Case No. 19-cv-05072-WHO

8              Plaintiffs,

9        v.                              **ORDER GRANTING MOTION FOR
                                         CLASS CERTIFICATION**
10  EQUINOX HOLDINGS, INC.,
                                         Re: Dkt. Nos. 67, 68, 69, 80, 81, 84, 93, 99,
11             Defendant.                106, 109

12

13       Plaintiffs Frank Fodera, Jr., Michael Bonella, and Genevieve Billson ("the plaintiffs") seek

14  certification of three classes of employees who worked for defendant Equinox Holdings, Inc.

15  ("Equinox") and allegedly received unlawful wage statements, were not provided nor paid for

16  meal or rest breaks, and performed off-the-clock work without proper pay. I will GRANT their

17  motion. The proposed classes are numerous, and the plaintiffs are typical and adequate class

18  representatives. They have provided sufficient evidence of common questions of law and fact—

19  namely, Equinox's alleged policies or practices—that, decided one way or another, will resolve

20  the issues on a class-wide basis. These questions predominate over individual issues, and class

21  litigation is a superior method of resolving them.

22       Also pending are a motion for leave to file a Fourth Amended Complaint, motions to

23  strike, and motions to seal. My decisions on these motions are explained throughout the Order.

24                            **BACKGROUND**

25       The plaintiffs are current or former employees of Equinox, a company that operates high-

26  end fitness clubs across the world, including more than 30 in California. Mot. for Class

27
28

Certification ("Mot.") [Dkt. No. 68] 2:25-3:11.  Equinox offers its members services that include individual personal training sessions, group fitness classes, and Pilates.  Oppo. [Dkt. No. 85] 1:14-16.  Fodera and Bonella worked for Equinox as both personal trainers and group fitness instructors; Billson was a Pilates instructor and group fitness instructor.  Mot. at 2:27-3:11.

According to the plaintiffs, personal trainers, group fitness instructors, and Pilates instructors (whom they collectively call "fitness instructors" or "FIs") have "virtually identical job duties and compensation structures."  *Id*. at 3:14-16.  They are paid a flat rate (a "session rate" or "class rate") for each session or class they teach.  *Id*. at 3:16-17.  They are also required to perform "session-related activities," which include scheduling the session or class, setting it up, cleaning up after, and interacting with clients before and after.  Mot. at 3:18-4:4 (citing Ex. 6).  Although employees clock in when teaching sessions, the plaintiffs allege that they are not permitted to clock in for other session-related activities.  *Id*. at 4:5-6.

There are some differences between the positions.  For example, the classes that the instructors teach vary in duration.  *See* Oppo. at 3:1, 4:1.  Personal trainers are allotted up to two or four hours per pay period for session-related activities (depending on their employment tier), while group fitness instructors get up to six hours per pay period, and Pilates instructors get a "suggested" two to three hours per week.  *See id*. at 2:5-8, 3:4-5, 3:24-26.  Personal trainers and Pilates instructors also set their own schedules.  *Id*. at 2:11-12, 3:28-4:1.

The plaintiffs allege that Equinox's policies and practices related to pay, meal and rest breaks, and wage statements violated several provisions of California's Labor Code.  *See* Third Am. Compl. ("TAC") [Dkt. No. 58] ¶¶ 52-106.  They sued Equinox in state court in April 2019; Equinox removed the case to this court in August of that year.  *See id*. at ¶ 5; Dkt. No. 1.  The TAC alleges seven causes of action under the Labor Code (failure to pay minimum and overtime

wages, failure to provide meal periods and rest periods, failure to pay for rest and recovery periods, failure to furnish accurate wage statements, and failure to pay wages earned at termination or discharge) as well as a violation of California's Unfair Competition Law.  TAC at ¶¶ 52-112.  The plaintiffs moved for class certification on January 5, 2022.  Dkt. No. 68.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions.  "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (Dec. 14, 2001).  The burden is on the party seeking certification to show that these prerequisites have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Certification under Rule 23 is a two-step process.  The party seeking certification must first satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Specifically, Rule 23(a) requires a showing that:

> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of those of the class; and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The party seeking certification must then establish one of three grounds set forth in Rule 23(b).  Fed. R. Civ. P. 23(b).  The plaintiffs seek certification under Rule 23(b)(3).  Mot. at 6:4.

A class action may proceed under Rule 23(b)(3) when "the court finds that the questions of

law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In deciding this, courts consider:

> (A) "the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action."

*Id.*

When considering class certification, the court accepts as true the complaint's substantive allegations, but "need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010).  The court may also consider any supplemental evidentiary submissions by the parties.  *Id.*  The court's "rigorous" class-certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim."  *See Dukes*, 564 U.S. at 351.  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.*

## DISCUSSION

## I.   MOTIONS TO STRIKE AND EVIDENTIARY OBJECTIONS

### A.  Motion to Strike Steiner and Fulimeni Declarations

Equinox moves to strike the declarations of two expert witnesses, Laura Steiner and Teresa

4

Fulimeni, proffered by the plaintiffs in support of their motion for class certification.  *See* Dkt. No. 80.  The motion is DENIED.

The Ninth Circuit has held that expert testimony submitted at the class certification stage is subject to the evidentiary standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  In applying that standard, "admissibility must not be dispositive.  Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage."  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).

*Daubert* is consistent with Federal Rule of Evidence 702, which governs the testimony of expert witnesses.  *See In re Viagra & Cialis Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 788-89 (N.D. Cal. 2020) (describing the relationship between *Daubert* and Rule 702).  Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion of otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Aside from the qualification requirement, there are two questions at the heart of the admissibility determination: whether the testimony is relevant and whether it is reliable."  *In re Viagra*, 424 F. Supp. 3d at 789.  The testimony is relevant "if the knowledge underlying it has a valid connection to the pertinent inquiry."  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036,

1044 (9th Cir. 2014) (citation omitted).  It is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*.

"The inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 594. Courts consider factors including: (1) whether the expert's theory or method is generally accepted in the relevant scientific community; (2) whether it can be or has been tested; (3) the technique's known or potential error rate; and (4) whether the method has been subjected to peer review and publication. *See id.* at 592-94.  The focus is on the expert's principles and methodology, not her conclusions. *Id*. at 595.

The Ninth Circuit has emphasized that Rule 702 "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citing *Daubert*, 509 U.S. at 588).  The court should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Both Steiner and Fulimeni are qualified to offer expert opinions in their field, primarily because of their knowledge, education, and experience.  They currently work at Employment Research Corporation (Steiner as the vice president, Fulimeni as a senior analyst), a Michigan-based firm that focuses on employment and wage and hour research. *See* Steiner Decl. [Dkt. No. 68-7] ¶ 2; Fulimeni Decl. [Dkt. No. 68-8] ¶ 2.  Both have extensive professional experience in audits and analyses, including of employment-related issues such as compensation. *See* Steiner

United States District Court
Northern District of California

Decl., Appendix A-1 (curriculum vitae); Fulimeni Decl., Appendix A-1 (same).  Steiner has

conducted surveys to estimate time worked, and used payroll and timekeeping data to estimate

unpaid wages.  *See* Steiner Decl., Appendix A-1.  Fulimeni has two degrees in economics and a

master of science in predictive analytics.  *See* Fulimeni Decl., Appendix A-1.  She has testified in

14 cases nationwide, including two wage and hour cases.  *See id*., Appendix A-2.  Steiner has

testified in a dozen cases, two thirds of which involved wage and hour issues or survey research.

*See* Steiner Decl., Appendix A-2.  This satisfies the threshold requirement of Rule 702.

Their testimony is also relevant to the inquiry at hand.  The plaintiffs intend to use a survey

of class members conducted by Steiner to show Equinox's liability regarding work performed off-

the-clock, which Fulimeni will then use to calculate the amount of off-the-clock work by class

members and unpaid minimum and overtime wages, if any.  *See* Mot. at 23:4-23; Fulimeni Decl.

at ¶¶ 54, 60. The survey will also collect information about meal and rest periods.[1]  *See* Steiner

Decl. at ¶ 8.  Accordingly, Steiner and Fulimeni's testimony—the underlying survey and its

results—has a valid connection to the questions the jury must answer about whether Equinox

required employees to work off the clock and if so, the amount of time involved.  It also relates to

the duration of meal and rest periods.  Relevance is therefore satisfied.

---

[1] In her declaration, Steiner provides a basic overview of the survey's methodology.  A random
sample of putative class members will be randomly selected and then sent an email explaining the
survey and inviting them to participate via a web link.  Steiner Decl. at ¶ 25.  The questions—
which include whether employees worked while clocked out for a meal break, received 10-minute
rest breaks, and spent time off-the-clock communicating with clients, creating or updating fitness
programs, and contacting potential clients—will be pretested to evaluate the respondents'
understanding.  *Id.* at ¶¶ 9, 30.  Participants who do not respond to the email will be called and
reminded about the survey, which they can either then complete online or by phone with a trained
interviewer.  *Id.* at ¶¶ 26-27.  Steiner anticipates that the survey will yield "at least 150 completed
responses," allowing for a "95 percent confidence level."  *Id.* at ¶ 31.  Those results will then be
extrapolated to the class as a whole to determine "the incidence of various behaviors."  *Id.* at ¶ 34.

Equinox primarily attacks the reliability of the proposed survey, arguing that it constitutes a "trial by formula" rejected by the Supreme Court in *Dukes*.  *See* Mot. to Strike Decls. [Dkt. No. 80] 9:21-25.  In *Dukes*, the plaintiffs tried to use depositions from a sample set of class members to determine liability for sex discrimination and resulting backpay for a Rule 23(b)(2) class of 1.5 million employees.  *See* 564 U.S. at 343, 367.  The Court held that this was impermissible because the employer was "entitled to individualized determinations of each employee's eligibility for backpay"—and present defenses to individual claims—under Title VII's remedial scheme.  *See id*. at 366-67.

*Dukes* "does not stand for the broad proposition that a representative sample is an impermissible means of establishing class-wide liability."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016).  "The underlying question . . . was whether the sample at issue could have been used to establish liability in an individual action."  *Id*. at 458.  In *Tyson Foods*, the Court held that the district court properly allowed a representative study analyzing how long it took employees to don and doff their protective gear.  *See id*. at 450.  Unlike *Dukes*, the Court wrote, where the "experiences of the employees . . . bore little relationship to one another," in *Tyson Foods* "each employee worked in the same facility, did similar work, and was paid under the same policy."  *Id*. at 459.  Accordingly, the representative sample could be used to "fill an evidentiary gap"—the employer's failure to keep adequate records—and show the hours that each employee worked, rather than overcome an "absence of a common policy."  *See id*. at 456-58.

My colleagues have similarly recognized the utility of representative samples in filling evidentiary gaps, distinguishing between what the Supreme Court held was permissible in *Tyson Foods* and what was not in *Dukes*.  *See, e.g., In re Autozone, Inc*., No. 10-MD-02159-CRB, 2016 WL 4208200, at *15-16 (N.D. Cal. Aug. 10, 2016) ("There is no question, then, that

8

representational evidence can help plaintiffs establish liability in class actions."); *Senne v. Kansas City Royals Baseball Corp.* ("*Senne I*"), 315 F.R.D. 523, 583 (N.D. Cal. 2016) ("Rather than merely filling in 'evidentiary gaps' in a situation where all of the employees were similarly affected by a uniform policy, plaintiffs here are attempting to paper over significant material variations that make application of the survey results to the class as a whole improper.").

Here, Steiner and Fulimeni's proposed survey would be used to fill in evidentiary gaps rather than overcome the absence of a common policy.  Critically, the plaintiffs have proffered other evidence of Equinox's policies and practices related to their claims that similarly affect class members who did similar work and were paid under similar policies.  That evidence includes Equinox's written policies, declarations and surveys from employees describing their work, depositions of Equinox officials, and shift data provided by Equinox.  Liability does not rise and fall with the survey; rather, it can be used alongside this evidence to estimate, for example, "the amount of uncompensated work each employee did."  *See Tyson Foods*, 577 U.S. at 450.  And unlike *In re Autozone*, where the court held that a representative sample could not be used to show when and how often employees took rest breaks, "particularly in the absence of a uniform policy," here there is additional evidence of policies and practices by Equinox related to meal and rest periods that allow for the survey's use.  *See* 2016 WL 4208200, at *15.

The court noted the availability of evidence beyond the representative sample when it ultimately certified the class in *Senne v. Kansas City Royals Baseball Corp.* ("*Senne II*"), No. 14-CV-00608-JCS, 2017 WL 897338, at *39 (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in part and remanded*, 934 F.3d 918 (9th Cir. 2019).  There, the court held that a survey would "allow the jury to ascertain *whether* the class members performed work and will provide estimates of the amounts of time they worked."  *Id*. at *24 (emphasis in original).  "This evidence," the court wrote, "may

9

be helpful to the jury, especially when considered in combination with other evidence such as the daily schedules and witness testimony." *Id*. The Ninth Circuit affirmed the court's determination, holding that "under *Tyson*, the representative evidence plaintiffs offered was adequate to meet their burden" of showing predominance for class certification. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 944-45 (9th Cir. 2019).

Equinox's other arguments regarding the survey's design, bias, and reliability go to the weight of the evidence rather than its admissibility. *See* Mot. to Strike Decls. at 14:12-15:4. "In general, issues of methodology, design, and reliability go to the weight of the survey evidence, rather than its admissibility. Thus, these issues often are addressed through cross examination." *Jimenez v. Allstate Ins. Co.*, No. CV-10-08486, 2019 WL 13088814, at *15 (C.D. Cal. May 13, 2019). Importantly, the survey has not yet been conducted. Once it is complete, Equinox may challenge it again at a later stage of litigation. My decision today does not preclude this.

In sum, the declarations of Steiner and Fulimeni (as well as the survey underlying those declarations) are admissible, at least at this point. Steiner and Fulimeni are both qualified to testify as experts under Rule 702, and the proffered testimony is relevant and reliable. Accordingly, Equinox's motion to strike these declarations is DENIED.

### B. Motion to Strike Plaintiffs' Surveys

Equinox also moves to strike the statements of 127 potential class members that the plaintiffs filed with their class certification motion. *See* Mot. to Strike Surveys [Dkt. No. 81] 7:3-27. It argues that the survey responses are not shielded by attorney-client privilege or the work product doctrine, and therefore should have been produced in disclosures or in response to discovery requests. *See id*. at 7:7-16. It also contends that the surveys should be struck because they were "obtained by misleading means" and because many are "illegible or have the wrong

10

signature or no verifiable signature." *Id*. at 7:17-25.

Federal Rule of Civil Procedure 26(b)(3) codifies the work product doctrine, shielding from discovery documents and other tangible things that are prepared by or for a party or its representative in anticipation of litigation. *See In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004). A party can overcome the work product protection by showing that it has a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

The surveys satisfy the doctrine's basic requirements. The plaintiffs' counsel prepared the questionnaire and solicited responses for this litigation, as stated in the email that was sent to potential class members asking them for information. *See* Mot. to Strike Surveys at 8:14-20 ("Our law firm is suing Equinox on behalf of current and former employees for off-the-clock work and other violations. We would like to hear from you about your experience working for Equinox!"). By responding, the potential class members prepared the documents in anticipation of litigation. And they did so for the representatives of one of the parties in this case: plaintiffs' counsel.

Equinox has not shown that it could not obtain the substantial equivalent of the survey responses without undue hardship. Equinox presumably has access to the names and contact information of the same employees that the plaintiffs' counsel contacted. It could undertake similar efforts to obtain the substantial equivalent of the plaintiffs' surveys—and could have done so before the motion for class certification was filed.[2]

---

[2] Nor were the plaintiffs required to disclose the surveys as part of their expert disclosure under Rules 23(a)(2)(B) or 26(b)(4)(C)(ii), as Equinox asserts. The pretrial schedule originally proposed by the parties and adopted by me set the hearing for the class certification motion on February 9, 2022, and expert disclosures by March 16, 2022. *See* Dkt. No. 56. Expert disclosure has always trailed the filing of this motion. Rule 26(a)(2) does not require advance expert disclosure for use in class certification briefing. *See Ridgeway v. Wal-Mart Stores Inc.*, No. C-08-05221-SI, 2014 WL 4477662, at *12 (N.D. Cal. Sept. 10, 2014).

Equinox is correct that some of the surveys have technical or other defects, which the plaintiffs sought to address in subsequent filings. *See* Mot. to Strike Surveys at 13:1-16; *see also* Dkt. No. 91. Even striking the 36 surveys that Equinox identified, the plaintiffs may still use the majority of the surveys. Because my decision on the class certification motion does not depend on the defective surveys, at this point, I need not make individual determinations about the 127 surveys covered by Equinox's motion. Should any of the defective surveys be relevant to future motion work, Equinox may object to their use at that time.

Equinox's motion to strike the surveys is DENIED.

### C.  Remaining Objections

Both parties objected to other evidence submitted with the various motions now before me. "Numerous district courts in this circuit have long concluded that it is appropriate to consider evidence at the class certification stage that may ultimately be inadmissible." *Sali*, 909 F.3d at 1004 n.2 (collecting cases). The evidentiary objections are therefore DENIED as moot. Should the contested evidence be used in subsequent stages of this litigation, the parties may object then.

## II.    CLASS CERTIFICATION

The plaintiffs seek to certify the following three classes:

(1) The Wage Statement Class: "[A]ll non-exempt employees employed by defendant in California from April 3, 2018 through the present, who received at least one wage statement with pay codes Overtime Prem; CA Rest Break; Break Premium; PT Ses Cancel; CanXNo show; Pilates No Show, and/or break violations."

(2) The Fitness Instructor Class: "All individuals who worked for defendant in one or more of the following positions – Personal Trainer, Group Fitness Instructor, and Pilates Instructor – in California from April 3, 2015 through the present."

(3) The Meal Period Regular Rate Class: "All individuals who worked as non-exempt employee [sic] for Equinox in California from April 3, 2015 through the present, and who received non-discretionary remuneration and were paid any meal period premium payments in the same pay period that the non-discretionary remuneration was earned."

United States District Court
Northern District of California

Mot. at ii:10-18.[3]

## A.  Numerosity, Typicality, and Adequacy

Three of Rule 23(a)'s requirements for class certification are met rather easily.

Numerosity is satisfied, as the plaintiffs have so far identified nearly 3,000 members of the Wage Statement Class, more than 5,600 in the Fitness Instructor Class, and over 400 in the Meal Period Regular Rate Class.  *See* Mot. at 6:19-26.  These numbers (which Equinox does not challenge) far exceed the general recognition that a proposed class of 40 or more members satisfies numerosity.  *See generally* Oppo.; *see also Farar v. Bayer AG*, No. 14-CV-04601-WHO, 2017 WL 5952876, at *5 (N.D. Cal. Nov. 15, 2017) (collecting cases).

The test is for typicality is whether "other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  It is a permissive standard—claims are typical "if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir. 2020) (citation omitted).

---

[3] The plaintiffs have moved for leave to file a Fourth Amended Complaint ("FAC").  Dkt. No. 69. The proposed amendments reorganize the TAC's classes to align with those in the class certification motion, and "clarify the nature of the claim for meal period violations."  *See id.* at 4-5.  The motion is GRANTED.  Federal Rule of Civil Procedure 15 directs the court to "freely give leave [to amend] when justice so requires," which the Ninth Circuit has held should be "applied with extreme liberality."  *Eminence Cap. LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citations omitted).  These amendments will not unduly delay the case nor prejudice Equinox, as they do not substantively change the proposed classes or underlying claims, and relate to discovery that is already underway.  Equinox has demonstrated its ability to respond to the amended allegations by doing so in response to the class certification motion.  To the extent that the phrase "and/or break violations" in the Wage Statement Class definition would create a failsafe class and that the plaintiffs are, as they state, amenable to removing that "unnecessary inclusion," it is stricken.  *See* Dkt. No. 77 at 7:2-22.  The plaintiffs may file the FAC (with this modification) within seven days of the issuance of this Order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Equinox asserts that typicality is thwarted by the "variation in work experiences and personal preferences among FIs" and that the plaintiffs' "personal circumstances do not resemble the majority of the class members," particularly any disciplinary history for time-keeping violations.  Oppo. at 24:5-8.  But according to Equinox, more than three-quarters of the plaintiffs' 147 declarants were also written up for time-keeping violations.  *See id.* at 17 n.15.  If anything, the plaintiffs' disciplinary history makes them *more* typical of the proposed class.  And any issues about variation in work experiences or personal preferences speaks to commonality and predominance, which are analyzed in detail below and do not, for the most part, affect typicality.

To determine adequacy, courts evaluate whether the named plaintiffs and their counsel "have any conflicts of interest with other class members" and whether they will "prosecute the action vigorously on behalf of the class."  *Ellis*, 657 F.3d at 985.  There are no apparent conflicts of interest between the named plaintiffs and their counsel and the proposed class members.  The plaintiffs and their counsel have also shown that they will prosecute this action vigorously on the class's behalf, as evidenced by the plaintiffs' ongoing participation (including sitting for depositions and responding to discovery), counsel's actions (including litigating this motion and others, taking depositions, and conducting discovery), and counsel's prior experience with wage and hour class actions.  *See* Mot. at 28:7-15.  Adequacy is no issue.

Accordingly, certification of the proposed classes ultimately turns on commonality, its cousin predominance, and, to a lesser degree, superiority.  I discuss these issues next.

**B.  Commonality and Predominance**

Rule 23(a)(2) requires plaintiffs to show "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Plaintiffs must demonstrate that the class members suffered "the same injury," meaning their claims "depend upon a common contention" that is of such a nature that

14

"determination of its true or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See Dukes*, 564 U.S. at 350. Plaintiffs must show not just the existence of a common question but "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. (internal citation omitted). To satisfy Rule 23(a)(2), "even a single common question will do." *Id*. at 359.

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This is a "far more demanding" inquiry than commonality. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). The predominance analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (citation and internal quotation marks omitted). It is generally satisfied if a party can show that an employer used a standard policy that was uniformly implemented. *See Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008) ("When the claim is that an employer's policy and practices violated labor law, the key question for class certification is whether there is a consistent employer practice that could be a basis for consistent liability."). The predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

The questions underlying the multiple claims and proposed classes essentially boil down to this: Did Equinox have a policy or consistent practice of requiring employees to work off the clock, of failing to provide (or properly pay for) meal and rest breaks, or of issuing unlawful wage statements? I address each in turn.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1. Off-the-Clock Work

Employers must compensate their employees for time worked and overtime.  *See* Cal. Lab. Code §§ 510, 1194.  Under California law, a plaintiff "may establish liability for an off-the-clock claim by proving that (1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (citation omitted).

The plaintiffs allege that Equinox's written policies and de facto practices require fitness instructors to perform unpaid, off-the-clock work, specifically creating or updating programs (referred to as "programming), communicating with members before and after sessions, and contacting prospective clients (called "leads").  Mot. at 18:12-14, 19:1-3; 23:9-12; 23:25-27.  In support, they rely on Equinox's compensation plans, employee depositions and surveys, and emails and a memo from Equinox administrators.  *See id*.

A facial challenge to an employer's policy or practice "is a legal question plainly capable of class-wide resolution."  *Saechao v. Landry's Inc*., No. C-15-00815-WHA, 2016 WL 1029479, at *6 (N.D. Cal. Mar. 15, 2016).  The plaintiff's allegations regarding Equinox's written policies—specifically, the compensation plans and their requirement of session-related work such as programming and communicating with clients—constitute such a challenge.  Whether the compensation plan was unlawful and whether employees were lawfully paid for session-related work are questions that can be resolved on a class-wide basis.  Individualized issues do not predominate these common questions, as the answers do not depend on the actions or inactions of individual employees, but rather Equinox's compensation plan and job requirements.

The plaintiffs have also offered sufficient evidence of an unofficial policy requiring employees to contact leads while off the clock.  "Courts generally hold that sufficient evidence of

an unofficial policy exists where the plaintiff offers multiple declarations from employees attesting

to the uniform application of that policy." *Campbell v. Vitran Express, Inc.*, No. CV-11-5029,

2015 WL 7176110, at *7-8 (C.D. Cal. Nov. 12, 2015) (finding that declarations from 15

employees at four different work sites was sufficient evidence of the existence of a uniform,

unofficial policy depriving class members of meal and rest breaks).  The plaintiffs submitted

dozens of statements from employees who worked at different Equinox locations and testified that

their managers gave them lists of potential clients to contact but did not permit them to clock in

while doing so.  Proving whether this informal policy exists is a matter for summary judgment or

trial.  Whether that issue is resolved in the plaintiffs' favor or Equinox's, it will drive the

resolution of the claim.  Nor do individualized issues predominate; an alleged uniform practice is

at issue.

Individualized issues do, however, predominate the plaintiffs' allegation that Equinox has

a practice of preventing fitness instructors from recording all session-related activity time,

resulting in unpaid minimum or overtime wages.  *See* Mot. at 21:15-18.  Equinox's written

policies allocate time for session-related activities, ranging from two to six hours per pay period,

depending on the position.  Almon Decl., Ex. 11.  To determine whether Equinox prevented

employees from recording all of their session-related activity time, the plaintiffs will have to show

that the session-related activity time exceeded the approved amount per pay period, which will

depend on (1) the employee's job title (and the number of hours thus allocated) and (2) the classes

they taught per pay period, which inherently vary in number, duration, and the amount and nature

of the session-related activities involved.  Some session-related activities may be performed

during the session itself (i.e., putting away equipment) while others may not be necessary (i.e.,

sessions where no equipment is used).  Additionally, if the employee reached the limit of their

17

allocated hours, the written policy directs them to speak to a manager about additional time.  *See id.*  Combined, this presents a highly individualized set of facts needed to determine whether Equinox prevented fitness instructors from recording their session-related time and whether they were uncompensated as a result.

This does not sink certification.  The plaintiffs challenge Equinox's written policies and allege that uniform practices require employees to perform off-the-clock work, specifically programming, communicating with clients outside of classes, and contacting leads.  Equinox denies that its policies or practices do so.  Answering these questions about Equinox's policies and practices—questions that predominate individualized issues—will drive the resolution of this issue.

### 2.  Meal and Rest Breaks

#### a.  Provision of Meal and Rest Breaks

California Labor Code section 226.7 prohibits employers from requiring employees to work during meal or rest periods mandated by an Industrial Welfare Commission order.  Cal. Lab. Code § 226.7(a).  If an employee works a period of more than five hours, an employer must provide a meal period of at least 30 minutes.  IWC Wage Order 2-2001 § 11(A).  An employer must provide a second 30-minute meal break if an employee works more than 10 hours.  *Id.* at § 11(B).

Employers "shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period."  *Id.* at § 12(A).  Employees are entitled to a 10-minute rest period for every four hours worked or "major fraction thereof"  *Id.*  However, employees working less than three and one-half hours are not entitled to a rest period.  *Id.*

"[E]mployers are only required to provide meal and rest periods, not to police them."

*Brewer v. Gen. Nutrition Corp.*, No. 11-CV-3587-YGR, 2014 WL 5877695, at *7 (N.D. Cal. Nov. 12, 2014) (citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. App. 4th 1004, 1040 (2012)).  An employer "satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted . . . break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. App. 4th at 1040. However, "an employer may not undermine a formal policy of providing . . . breaks by pressuring employees to perform their duties in ways that omit breaks." *Id.*  Even if an employer has a lawful policy, "proof of an informal but common scheduling policy that makes taking breaks extremely difficult, or other informal means of exerting pressure to discourage taking meal and rest breaks, would be sufficient to establish liability to a class." *Brewer*, 2014 WL 5877695, at *7.

The plaintiffs allege that a combination of policies and practices denied employees rest breaks.  Mot. at 14:1-9.  First, they contend that Equinox had a uniform policy and practice prohibiting fitness instructors from taking 10-minute breaks while teaching sessions.  *Id.* at 14:2-3. Second, they allege that Equinox allowed fitness instructors to schedule and work up to five consecutive one-hour sessions "on the clock, with no gaps between sessions."  *Id.* at 14:4-5. Taken together, the plaintiffs allege that these policies effectively denied fitness instructors their required rest breaks.  *See id.* at 14:5-7.  In support, they again proffer depositions, declarations, and surveys from dozens of employees, including two former managers, stating that fitness instructors regularly worked shifts of 3.5 hours or more without receiving a paid 10-minute rest break.  *See id.* at 14:9-11.

The plaintiffs make a similar argument regarding meal breaks.  First, they contend that Equinox's computerized scheduling system "requires sessions and classes to be scheduled exactly on the hour or 15, 30, or 45 minutes past the hour" and as a result, fitness instructors were

United States District Court
Northern District of California

"frequently scheduled with exactly 30 minutes between sessions." *Id*. at 16:15-18.  The plaintiffs

allege that those 30 minutes were not uninterrupted by work, in part because fitness instructors

had to clock back in and walk to their next session before the full 30 minutes had elapsed, or else

they would be late to the session. *See id*. at 16:14-21.  Next, the plaintiff assert that Equinox had a

policy allowing fitness instructors to work shifts of five consecutive hours that began or ended

with a session. *Id*. at 17:4-6.  Because Equinox required fitness instructors to set up before and

clean up after sessions without clocking in, the plaintiffs contend that this too deprived these

employees of their full 30-minute meal breaks. *See id*. at 17:7-12.  Again, the plaintiffs submit as

evidence statements from employees, along with data that Equinox provided showing that fitness

instructors worked thousands of shifts of five or more consecutive hours that began or ended with

a session during the proposed class period. *See id*. at 16:13-14 (citing in part Almon Decl., Ex. 34

at 7-9).

    In response, Equinox relies heavily on its written handbook, addendum, and standard

operating procedures, which state that employees are lawfully entitled to uninterrupted meal and

rest breaks and provide their required durations. *See* Oppo. at 16:21-22 (citing Exs. 12-13).  But

an employer may not undermine its formal policies of providing breaks by pressuring its

employees to work in a way that omits breaks. *See Brinker*, 53 Cal. App. 4th at 1040.  The

plaintiffs have supplied enough proof of informal policies that either made it difficult for

employees to take their meal or rest breaks or discouraged them from doing so, establishing

common questions of law and fact that could be answered for the class as a whole. *See Brewer*,

2014 WL 5877695, at *7.  This evidence includes employee statements and Equinox's own

requirements of those employees.  Session-related activities include setting up or cleaning up

equipment and talking to clients before or after the session.  In situations where employees had

exactly 30 minutes between sessions—as many have stated—any one of those session-related activities would cut into the meal break. Even if *no* session-related activity needed completion, employees stated that the physical act of clocking in and out (a relatively simple task, but one that still takes some amount of time) would cut into their meal break. And Equinox's own numbers show thousands of consecutive, five-hour shifts worked during the class period, further supporting the plaintiffs' allegation that employees worked without proper meal breaks. Similar statements and data support the plaintiffs' claim about rest breaks.

Equinox also asserts that fitness instructors "exercise significant autonomy" over their schedules, "which are based on their availability, and individual circumstances and preferences." Oppo. at 20:9-12. It argues that determining whether employees took their full meal or rest breaks is therefore "dependent on a multitude of facts unique to each employee," which would predominate any common questions of law or fact. *See id*. at 21:24-27.

The case that Equinox primarily relies upon is distinguishable. In *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (2020), the Ninth Circuit upheld the district court's refusal to certify a "rest break class" because the plaintiff "failed to show that employees suffered the common injury of being deprived of rest-period premiums to which they were legally entitled." Although the named plaintiff alleged that her employer's written rest break policy was lawfully deficient, "she did not show that the policy was applied to employees in a way that violated California law." *Davidson*, 968 F.3d at 967. Moreover, her own declaration was "silent" on a critical point: whether she received rest breaks. *Id*.

Unlike in *Davidson*, these plaintiffs have supplied dozens of declarations and surveys from employees stating that they went without meal or rest breaks, along with data suggesting that consecutive scheduling prohibited such breaks from occurring. Individualized issues will not

21

predominate the common questions of whether Equinox lawfully provided meal and rest breaks, as the plaintiffs again base these claims on various policies and practices. Commonality and predominance are satisfied.

### b. Meal Period Rate

Should an employer fail to provide an employee a compliant meal or rest period, California Labor Code section 226.7 provides that "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided." Cal. Lab. Code § 226.7(c). The California Supreme Court recently decided that the "regular rate of compensation" "encompasses not only hourly wages but all nondiscretionary payments for work performed by the employee." *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal. 5th 858, 878 (2021). The court made this decision retroactive. *See id*. at 880.

Equinox's sole challenge to this claim is that certification should be denied because it is a "brand-new claim" not pleaded in the TAC. *See* Oppo. at 7:14-16. This is untrue. The TAC alleges that Equinox failed to provide compliant meal periods and that when it did so, it "failed to pay one hour of pay at class members' regular rate of compensation for each workday that a compliant meal was not provided." *See* TAC at ¶ 3. These allegations are repeated elsewhere in the TAC. *See, e.g., id*. at ¶ 35 ("Defendants failed to pay plaintiffs and class members premium payments for each missed or non-compliant meal period."), ¶ 72 ("During the class period, defendants have routinely failed to provide the class members, including plaintiffs, with compliant meal periods . . . and have failed to compensate class members, including plaintiffs, for those non-compliant meal periods, as required by California Labor Code § 226.7 . . .").

The plaintiffs have shown a common, predominate question: whether Equinox paid employees less than the regular rate of compensation for missed meal breaks. *See* Mot. at 12:19-

21. Equinox's uniform wage statements, coupled with payroll records, supply the common proof that would resolve this claim on a class-wide basis.

### 3. Wage Statements

Section 226(a) of the California Labor Code requires employers to furnish to employees wage statements that accurately show information including the "total hours worked by the employee" and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate." *See* Cal. Lab. Code § 226(a)(2), (9). Section 226(e) allows an employee to recover damages if they "suffer[ed] injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a)." *Id*. § 226(e). A claim for damages under Section 226(e) therefore "requires a showing of three elements: (1) a violation of Section 226(a); (2) that is 'knowing and intentional;' and (3) a resulting injury." *Willner v. Manpower Inc*., 35 F. Supp. 3d 1116, 1128 (N.D. Cal. 2014).

The plaintiffs allege that Equinox violated Section 226(a)(2) because its standardized wage statements did not show the correct total hours worked when certain pay codes appeared. Mot. at 8:6-10. The plaintiffs allege that Equinox either double-counted overtime hours, included "placeholder" hours, or otherwise misstated the total hours worked. *See id*. at 8:11-9:23. In support, it relies on the deposition of Equinox's person most knowledgeable, who described the wage statements Equinox issued to non-exempt employees in California. *See id*. (citing Almon Decl., Ex. 14, Tabui-Yun Depo.).

The plaintiffs allege a violation of Section 226(a)(9) for Equinox's failure to show all of the applicable hourly rates in effect during the relevant pay period and the number of hours worked at each. Mot. at 10:2-4. It again points to the deposition of the person most knowledgeable, who stated that a representative Equinox wage statement did not show the actual

overtime rate paid to the employee, instead showing two separate overtime categories, neither of which showed the correct rate. *See id.* at 10:4-19 (citing in part Tabui-Yun Depo. at 38:8-18, 51:20-25, 53:14-18, and 142:11-16).

Equinox first contends that it had no uniform policy of using unlawful wage statements because it had a good faith belief that the statements complied with the law. Oppo. at 22:14-16. This goes to the merits of the claim, not whether class certification is appropriate.

Equinox then argues that in order to prove an injury under section 226(e)(1), the plaintiff must show a "concrete or tangible loss as a result of the allegedly deficient information" on her wage statement, which may include "the possibility of not being paid overtime, employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, [and] forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked." *See id.* at 23:1-13 (citing *Troester v. Starbucks Corp.*, No. CV-12-07677, 2020 WL 553572, at *3 (C.D. Cal. Jan. 27, 2020)). According to Equinox, individualized issues over whether employees suffered actual injuries, and if so, what those injuries were, would predominate over any common questions. *Id.* at 23:12-13.

This argument fails for two reasons. First, it overlooks Equinox's own argument that employees could "simply add together the total regular hours figure and the total overtime hours figure shown on the wage statement to arrive at the sum of hours worked." Oppo. at 22:10-13 (citation omitted). *Troester* said forcing employees to use math to analyze their wages would constitute an injury. *See* 2020 WL 553572, at *3.

More importantly, Equinox's argument ignores the statutory language. Section 226(e)(2)(B) provides that an employee "is deemed to suffer an injury . . . if the employer fails to

provide accurate and complete information" as required by subdivision (a) "and the employee cannot promptly and easily determine from the wage statement alone" information including their total hours worked (section 226(a)(2)) or the applicable hourly rates in effect (section 226(a)(9)). *Id*. § 226(e)(2)(B). In other words, a facial violation of section 226(a) is enough to constitute an injury. The plaintiffs have alleged this.

Equinox's person most knowledgeable stated that the company used the same wage statements for non-exempt employees in California during the class period. Mot. at 8 n.3 (citing Almon Decl., Ex. 14, Tabui-Yun Depo. at 24:4-25:2, 36:16-19). Whether Equinox provided accurate and complete wage statements, and whether putative class members could promptly and easily determine information from them, are "common question[s] with a common form of proof." *Amey v. Cinemark USA Inc.*, No. 13-CV-05669-WHO, 2018 WL 3956326, at *7 (N.D. Cal. Aug. 17, 2018). As in similar cases, Equinox's liability can be determined by the uniform wage statements that it used as well as "testimony of leadership . . . regarding knowledge and intent of any errors." *Id*. (citing *Clemens v. Hair Club for Men, LLC*, No. C-15-01431-WHA, 2016 WL 1461944, at *8 (N.D. Cal. Apr. 14, 2016)). Commonality and predominance are satisfied for this claim as well.

In sum, the plaintiffs have shown common questions of law or fact for all three classes. Because the questions arise from Equinox's alleged policies and practices, the common questions presented predominate over any individualized inquiries. Whether the merits of the plaintiffs' claims prove true will be determined at another stage of this litigation. At this point, the plaintiffs have proffered sufficient evidence supporting certification.

## C. Superiority

Finally, a class action is the superior method for fairly and effectively adjudicating these

issues.  *See* Fed. R. Civ. P. 23(b)(3).  The proposed class consists of thousands of members; individual suits seeking to resolve the same issue would cut against judicial economy and strain already-overloaded federal courts.  Moreover, the cost of bringing a claim would likely exceed the damages available to an individual litigant, an hourly employee who likely has limited financial and other resources to bring suit.  To the extent that class members have brought other litigation against the defendant, the class definitions could be tailored, if necessary, to exclude duplicative membership.  This forum is desirable for the litigation, as the class members worked in California and California law governs.  Finally, I see no difficulty in managing this case as a class action.

For these reasons, the plaintiff's motion for class certification is GRANTED.  These classes are certified:

> (1) The Wage Statement Class: All non-exempt employees employed by defendant in California from April 3, 2018 through the present, who received at least one wage statement with pay codes Overtime Prem; CA Rest Break; Break Premium; PT Ses Cancel; CanXNo show; Pilates No Show.

> (2) The Fitness Instructor Class: All individuals who worked for defendant in one or more of the following positions – Personal Trainer, Group Fitness Instructor, and Pilates Instructor – in California from April 3, 2015 through the present.

> (3) The Meal Period Regular Rate Class: All individuals who worked as non-exempt employee [sic] for Equinox in California from April 3, 2015 through the present, and who received non-discretionary remuneration and were paid any meal period premium payments in the same pay period that the non-discretionary remuneration was earned.

## III.   MOTIONS TO SEAL

The parties filed six motions to seal in connection with the above-referenced motions. Dkt. Nos. 67, 84, 93, 99, 106, 109.

A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).  Under Ninth Circuit law, a party must demonstrate "compelling

reasons" to seal filings where "the motion at issue is more than tangentially related to the underlying cause of action." *Id.* at 1096-99. When the motion is not related or only tangentially related to the merits, a party need only show "good cause" to seal. *Id.* Courts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification. *See Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).

What constitutes a compelling reason is "left to the sound discretion of the trial court." *Ctr. for Auto Safety*, 809 F.3d at 1097 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)). The Ninth Circuit has given examples, such as "when a court record might be used to gratify private spite or promote public scandal, to circulate libelous statements, or as sources of business information that might harm a litigant's competitive standing." *Id.* (citation and quotation marks omitted).

Under this district's Local Rules, sealing requests must also be narrowly tailored to seek sealing only of sealable material. *See* Civ. L.R. 79-5(c). "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." *Id.*

The motions to seal are flawed in several ways. First, the parties apply the wrong standard in each of the six motions, asserting that there is good cause to seal the documents, not that there are compelling reasons to do so. Next, they often argue, at least in part, that documents are sealable because they were designated as "confidential" or fall within the ambit of a protective order. The parties' focus should be on whether compelling reasons exist that warrant sealing these records—references to a stipulation or protective order allowing documents to be marked confidential does not suffice. *See* Civ. L. R. 79-5(c).

Most importantly, the motions to seal are overbroad.  Combined, the six motions seek to seal approximately 175 records, most of which in their entirety.  Given the nature and volume of the sealing requests, granting them as-is would make it difficult, if not impossible, for the public to understand the basic facts underlying the motion for class certification as well as my rationale for granting it.  For example, the parties seek to seal exhibits and references within their papers such as descriptions of "session-related activities," the varying durations of different classes, the number of people in the Fitness Instruction Class, and the number of consecutive shifts allegedly worked.  These factual matters not only relate to issues of numerosity, commonality, or predominance, but in the case of session-related activities, provide the basic underpinnings of the case.

In addition, the parties seek to seal certain exhibits in their entirety when it appears that redactions would sufficiently protect any sensitive information.  For instance, the parties seek to seal all of Exhibits 1 through 44 to the Tolin declaration.  *See* Dkt. No. 67.  While it is true that these exhibits, which are emails, include personal contact information of third parties, that contact information can be redacted so as to avoid sealing the exhibits in their entirety.  Another example: The parties seek to seal the Fulimeni declaration in its entirety, including the attached exhibits.  *See id*.  It is unclear why information about Fulimeni's current job (as described within the declaration) or her curriculum vitae (attached to the declaration) warrant sealing.  The parties also seek to seal a number of depositions; these could undoubtedly be redacted to limit the amount of information filed under seal.

There might be compelling reasons to seal some of these exhibits, either in their entirety or in part.  For example, allowing Equinox's written internal policies or training manuals to become public could give its competitors information that could harm Equinox's competitive standing.

*See, e.g.,* Dkt. No. 71-1 at ¶ 14.  However, the expansive nature of the sealing requests make it difficult to ascertain what those compelling reasons might be and how they relate to the specific information at issue.

For these reasons, the parties' motions to seal are DENIED without prejudice.  Within two weeks of the issuance of this Order, the parties shall file a single renewed motion stating compelling reasons for sealing the specific information at issue and otherwise complying with Civil Local Rule 79-5.  This joint motion should be narrowly tailored, both in the number of exhibits the parties seek to seal and in the content of those exhibits.  Overbroad requests will be denied.

Along with their motion, the parties must file two tables.  The first should list the exhibits or specific portions thereof that the parties wish to seal, the docket numbers where those documents appear, and the purported rationale for sealing (including a citation to the declaration articulating that rationale).  The second should list the exhibits that the parties no longer wish to seal and the docket numbers where those documents appear.  Any information not identified will be deemed not appropriately sealed.[4]

## CONCLUSION

The plaintiffs' motion for class certification is GRANTED.  The plaintiffs are appointed lead plaintiffs and their counsel as class counsel.  The defendants' motions to strike are DENIED. The plaintiffs' motion for leave to file a FAC is GRANTED.  The motions to seal are DENIED without prejudice.  The parties' renewed joint motion to seal is due within two weeks of the

---

[4] In this Order, I referenced some information contained within exhibits that the parties moved to seal.  When I did, I described that information in a general manner so as to avoid revealing any details that might warrant sealing while also providing the public an understanding of this case and my decision to certify the classes.

issuance of this Order.

**IT IS SO ORDERED.**

Dated: May 24, 2022



William H. Orrick
United States District Judge